IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID L. GARBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-155 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM ORDER

CONTI, District Judge

### *Introduction*

Pending before the court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of David L. Garber ("plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 423, *et seq.*, and Supplemental Social Security ("SSI") under Title XVI of the SSA, 42 U.S.C. §§ 1381, *et seq.* Plaintiff contends that the decision of the administrative law judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence and that the case should be remanded for the ALJ to consider properly all the evidence as presented. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's motion and grant defendant's motion because the decision of the ALJ is supported by substantial evidence.

*Procedural History*

Plaintiff filed the applications at issue in this appeal on a protective basis on May 9, 2003 asserting a disability since February 11, 2002 by reason of a head injury with complications, multiple vision problems, headaches, and memory problems. (R. at 66-67.) He was denied at the initial level (R. at 32) and then filed a request for a hearing. (R. at 13.) On July 7, 2004 a hearing was held before the ALJ. (R. at 295-321.) Plaintiff appeared at the hearing and testified. (R. at 295, 297-315.) A vocational expert (the "VE") also testified. (R. at 315-20.) Plaintiff was represented by an attorney at the hearing. (R. at 295.) In a decision dated August 13, 2004, the ALJ determined that plaintiff was not disabled and, therefore, not entitled to benefits. (R. at 17-24.) Plaintiff timely requested a review of that determination and by letter dated January 28, 2005 the Appeals Council denied the request for review. (R. at 6-9.) Plaintiff subsequently commenced the present action seeking judicial review.

*Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Burnhart, 312 F. 3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court

to substitute its own conclusions for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### *Plaintiff's Background and Medical Evidence*

Plaintiff was 46 years old at the time of the hearing before the ALJ. (R. at 298.) He is married and lives with his wife. Id. Plaintiff is a high school graduate. Id. Plaintiff has a driver's license but testified that he does not drive. Id. Plaintiff worked as a pipe cleaner for over twenty years and before that at an automotive center (R. at 78-78, 299-300.) Approximately one year after his accident in February 2002, plaintiff attempted to return to work from January 6, 2003 through February 24, 2003. Id. (R. at 59, 67.) Other than that, there is no indication in the record that he engaged in any substantial gainful activity at any time since the alleged onset date. The ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date. (R. at 18.)

In February 2002 plaintiff suffered trauma to his left eye while working. Plaintiff was struck in the head around his left eye in his left orbital region with a heavy object – a metal pipe or metal clamp, described at one point in the record as weighing 300 pounds. (R. at 254.) Plaintiff was knocked temporarily unconscious. (R. at 114.) Plaintiff was discovered by coworkers and transported to St. Francis Medical Center for treatment. (R. at 114.) The emergency room records describe the incident as "accidental trauma to the left periorbital area

with a metal clamp" that led to "loss of consciousness." Id.[1]  Other indications in the record suggest that in addition to trauma to the head and left eye, the accident caused trauma to plaintiff's back and neck. (R. at 220.)  Upon examination he was found to have decreased vision and extreme pain and edema around the left periorbital area of the left eye. (R. at 114, 116.) During the course of emergency room treatment a CAT scan of plaintiff's head was normal and a CAT scan of his left sinus showed an intact globe with a medial, orbital fracture with blood filling the ethmoid sinus and inferior orbital wall fracture with blood filling the maxillary sinuses. (R. at 116.)

Plaintiff was admitted to a regular bed at St. Francis Medical Center with multiple left orbital fractures and head injury. (R. at 114, 117.)  He was assessed to have suffered traumatic optic neuropathy[2] (left eye), medial wall and inferior wall fractures, hyphema[3] (left eye), as well as a small laceration to his left upper eyelid. (R. at 118-21).  He was treated with intravenous steroids, atropine 1% drops, Alphagan drops, Pred Forte drops, and Zantac. Id.  On his second day in the hospital, though reportedly more comfortable, plaintiff showed extensive periorbital ecchymosis[4] and continued to have decreased vision in his left eye. Id.  The medical staff noted that the hyphema had subsided and intraocular pressure had decreased. Id.  Oro-maxillofacial

---

[1] Plaintiff described the incident as a "pipe hit[ting] [him] in [his] left eye." (R. at 302.)

[2] "Optic neuropathy" is defined as "pathological injury to the optic nerves or the blood supply to them. . . . "  Taber's Cyclopedic Medical Dictionary at 1462 (20th ed. 2005).

[3] "Hyphema" is defined as "blood in the anterior chamber of the eye, in front of the iris." Taber's Cyclopedic Medical Dictionary at 1045 (20th ed. 2005).

[4] "Ecchymosis" is defined as "a bruise, that is, superficial bleeding under the skin or a mucous membrane."  Taber's Cyclopedic Medical Dictionary at 659 (20th ed. 2005).

surgery was consulted, and though there was medial wall and inferior wall fracture of plaintiff's orbit, there was no evidence of muscle entrapment and no need for surgical intervention at that time. Id.

Upon discharge on February 12, 2002, plaintiff was given Alphagan drops, Pred Forte drogs, and atropine drops for his left eye as well as oral prednisone on a tapering dose. (R. at 115.) Plaintiff was instructed to follow up with the St. Francis Medical Center Eye Unit in approximately two weeks time and to see oro-maxillofacial surgery as an outpatient. Id. Plaintiff subsequently received Workers' Compensation for the injury. (R. at 55-57.)

Outpatient records from St. Francis Medical Center Eye Unit indicate that plaintiff received follow up care on February 26, 2002; March 25, 2002; June 17, 2002; and August 26, 2002. (R. at 131-134). Records indicate that plaintiff suffered from traumatic optic neuropathy to the left eye, traumatic ptosis[5] in his left eye, and floppy eyelid syndrome. Id. Handwritten notes indicate "Ø - mild improvement @ 4 mo." or "none to mild improvement after four months," (R. at 132), and "may need surgery." (R. at 133).

On July 9, 2002 John Guehl, D.O., performed an independent medical examination of plaintiff for PMA Insurance Group. (R. at 126-28). Dr. Guehl noted plaintiff's continuing complaints of ptosis, double vision, and decreased vision. (R. at 127). Dr. Guehl concluded that plaintiff had mild ptosis as a result of the lid laceration, history of traumatic optic neuropathy, and mild left eye hypertropia[6] related to his fractures. Id. Dr. Guehl opined that the care to date

---

[5]"Ptosis" is defined as "dropping or drooping of an organ or part, as the upper eyelid from paralysis. . . ." Taber's Cyclopedic Medical Dictionary at 1813 (20th ed. 2005).

[6]"Hypertropia" is defined as "vertical strabismus upward." Taber's Cyclopedic Medical Dictionary at 1045 (20th ed. 2005). "Strabismus" is defined as "a disorder of the eye in which

was appropriate but not complete, noting specifically the possibility of surgical repair of the ptosis, though noting that the doctor at Allegheny General Hospital reportedly wished to wait to see how much the ptosis spontaneously improved, and the double vision.  Id.  Dr. Guehl indicated that plaintiff's vision "appeared to correct slightly with glasses; however, he does appear to have decreased acuity in the left eye" and double vision.  Id.  Dr. Guehl indicated his belief that plaintiff could return to work in some capacity, but indicated that he did not think that plaintiff should be driving due to his degree of double vision and that he should not be on ladders or catwalks due to his eye changes.  Id.  Dr. Guehl indicated his belief that plaintiff had yet to reach maximum medical improvement and that the doctors managing his case at St. Francis or Allegheny General would need to render opinions as far as plaintiff reaching permanent improvement.  Id.

Dr. Thomas Findlan, D.O., wrote a letter on July 23, 2002 summarizing plaintiff's treatment for his eye condition and indicating that his vision was slowly improving since the accident, but that his visual field does seem to be "severely constricted" and he's suffering from ptosis of the left eye, which Dr. Findlan opined would impair plaintiff's function at work.  (R. at 129).  Dr. Findlan further recommended that plaintiff be off work for one year from the time of his injury.  Id.

Plaintiff received treatment, including surgery, in 2002 and 2003 from ophthalmologists Dr. Charles J. Kent, M.D., and Dr. David H. Rhodes, M.D., at Everett & Huitte Ophthalmic Association.  (R. at 166, 190.)  On October 4, 2002, Dr. Kent performed an external levator

---

optic axes cannot be directed to the same object. . . ." and one eye deviates.  Taber's Cyclopedic Medical Dictionary at 2082-83 (20th ed. 2005).

advancement operation at Mercy Hospital on plaintiff for the traumatic ptosis in his left upper eyelid. (R. at 146.) Follow up visits indicated that plaintiff continued to complain of horizontal diplopia,[7] for example on December 17, 2002 (R. at 175). On March 5, 2003 plaintiff saw ophthalmologist Dr. David H. Rhodes, M.D.  (R. at 190-91). In a letter, Dr. Rhodes summarized the examination that day, noting that plaintiff's vision with correction was 20/30+ in his right eye and 20/40- in his left eye. Id. Dr. Rhodes noted a slight left afferent pupillary defect, ocular motility of full rotation with intermittent exotropia, particularly on eyes left; a superior visual field cut in both eyes, more marked on the left eye; and a nerve fiber bundle defect on the left eye. Id. Dr. Rhodes indicated plaintiff suffered mild optic neuropathy involving the left eye, and that the intermittent exotropia[8] on left gaze would occasionally give plaintiff horizontal double vision. Id. Dr. Rhodes noted that exotropia was demonstrated during the examination, but not consistently. Id.

In a letter dated March 27, 2003 responding to a request from the Bureau of Disability Determination, Dr. Kent indicated that plaintiff had traumatic optic neuropathy due to being hit by a pipe at work and had suffered acute injury. (R. at 166.) Dr. Kent indicated the injury had decreased plaintiff's vision on the left side, that he now has 20/40 best corrected vision on the left side, and that he had traumatic ptosis for which he underwent repair on October 4, 2002 with improvement of his visual field as a result. Id. Dr. Kent confirmed plaintiff's persistent complaint of intermittent diplopia and observed an intermittent exotropia during his examination

---

[7]"Diplopia" is defined as "two images of the same object seen at the same time;" diplopia is a synonym for "double vision." Taber's Cyclopedic Medical Dictionary at 607 (20th ed. 2005).

[8]"Exotropia" is defined as "divergent strabismus; abnormal turning outward of one or both eyes." Taber's Cyclopedic Medical Dictionary at 760 (20th ed. 2005).

on March 5, 2003, meaning his eyes deviated outward.  Id.  Dr. Kent opined that this recurrent exotropia makes it difficult for plaintiff to drive and any position where plaintiff would do mechanical labor or use equipment somewhat dangerous.  Id.  Dr. Kent further indicated his expectation that plaintiff's problems will be ongoing and that he did not expect them to improve significantly with time.  Id.  Medical records from Everett & Hurite indicated that plaintiff continued to complain of problems with his visual field and visual acuity, diplopia, headaches, persistent redness, irritation, blurry vision, and difficulty judging distances.  (R. at 167.)  Plaintiff did indicate that adjusting his glasses and lighting improved things.  Id.

In a letter dated July 28, 2003, Dr. Rhodes gave his opinion that plaintiff had mild optic neuropathy involving the left eye as a result of the blunt trauma, that his intermittent exotropia occasionally gives plaintiff horizontal double vision, and "from a strictly workmen's compensation standpoint, and using the tables published by the AMA Guide for Physical Impairment," he calculated that plaintiff has 38% impairment of the visual system as a result of the injury which means "the left eye still contributes to the visual system in the neighborhood of 60%."  (R. at 190-91.)  Dr. Rhodes opined that, assuming plaintiff's job did not require any close, fine motor skills or movement, he could continue working.  Id.

Plaintiff also saw ophthalmologist Dr. Frederick J. Scheib, M.D.  On January 6, 2004 plaintiff complained of pain in his left eye and sinuses and floaters. (R. at 281.)  Dr. Scheib requested diagnostic tests from the Department of Radiology/Nuclear Medicine at The Washington Hospital which were done in January 2004.  (R. at 279.)  These tests – CT scans obtaining serial axial and serial coronal images through the orbits and paranasal sinuses – indicated that the mid portion of plaintiff's left lamina papyracea was depressed, but no acute

fracture was identified; there was a small mucus retention cyst within the right maxillary sinus; and osteameatal complexes were quite narrow bilaterally with mucosal thickening severely narrowing the right osteomeatal complex. Id. Plaintiff saw Dr. Scheib again on June 23 and June 25, 2004. (R. at 270-78.) Dr. Scheib noted ptosis and trichiasis[9] in the left eye, trauma to orbit/head and noted that plaintiff would benefit from lid surgery. Id. In a letter dated February 23, 2004 Dr. Scheib indicated that plaintiff's vision corrects to 20/50 right eye and 20/200 left eye. (R. at 258.) He opined that plaintiff may also have retrobulbar[10] nerve injury, left greater than right, that he doubted that plaintiff would have any significant improvement in the future, that he doubted that plaintiff will be employable in his previous job in the future, and that vision in plaintiff's left eye will be limited to being able to see "large" objects. Id.

In addition to plaintiff's eye problems, he also complained of back and neck problems which may have been a result of the accident. Dr. Kamlesh B. Gosai, M.D., MPH, plaintiff's primary care physician, treated plaintiff prior and subsequent to the injury. (R. at 220, 220-53.) Dr. Gosai's records show that plaintiff complained of lower back pain after the accident and reported having no history of back problems. (R. at 241.) Plaintiff's lumbar spine was evaluated and found to be normal on March 27, 2003. (R. at 247.) Records indicate that plaintiff continued to complain about back pain, but was given pain medication and some physical therapy for his back, and reported on April 5, 2002 that he believed his back might be responding

---

[9]"Trichiasis" is defined as "inversion of eyelashes so that they rub against the cornea, causing a continual irritation of the eyeball." Taber's Cyclopedic Medical Dictionary at 2234 (20th ed. 2005).

[10]"Retrobulbar" is defined as "behind the eyeball." Taber's Cyclopedic Medical Dictionary at 1902 (20th ed. 2005).

to the therapy. (R. at 238-42). Further testing including an electromyography report and MRI indicated normal lumbar spine, though the MRI showed dessiccation of the disks in the lumbar region but no nerve involvement. (R. at 224, 230-33.) Records, however, indicate that some of plaintiff's physicians found that he suffered a lumbosacral strain with symptoms of left lower extremity radiculopathy[11] as a result of his accident. (R. at 224-28.) Dr. Gosai diagnosed plaintiff with lumbrosacral disc disease with radiculopathy as well as noting his eye problems and chronic diplopia and poor visual acuity. (R. at 218.)[12]

Dr. Gosai and certified nurse practitioner Suzanne Skrypak, CRNP, wrote two reports regarding plaintiff dated respectively January 12, 2004 and December 12, 2003. (R. at 220-21, 222-23). In both reports, they indicate their diagnoses of lumbar radiculopathy, lumbar sprain secondary to fall, and chronic diplopia of the left eye. Id. In the December 12, 2003 letter, they indicated that the diplopia does not appear to be resolving and appeared to be a permanent injury and that the lower back pain had not improved. (R. at 222.) They indicated that plaintiff cannot sit or stand or walk for any longer than 20 to 30 minutes at a time and has difficulty lifting anything. Id. They indicated that his MRI results suggested desiccation of the disc and spinal stenosis. (R. at 223.) In both letters, they indicated their opinion that plaintiff met the impairments identified by the SSA for musculoskeletal injury of the lumbosacral spine with

---

[11]"Radiculopathy" is defined as "any disease of a nerve root." Taber's Cyclopedic Medical Dictionary at 1842 (20th ed. 2005).

[12]There are also indications in Dr. Gosai's records that plaintiff suffered abdominal pain, had history of hypertension, an umbilical hernia, reflux problems, and colon polyps. (R. at 234.) Plaintiff had an operation to repair his incarcerated umbilical hernia on October 9, 2002, (R. at 152), and an EGD and colonoscopy on September 26, 2002 which resulted in a diagnosis of non-erosive gastroesophageal reflux disease. (R. at 137.)

radiculopathy and chronic diplopia. (R. at 221, 223.) They further opined that his disability prevented him from performing his prior job and would make it very difficult for him to do any substantial gainful employment because he cannot stand or sit for any long period of time, needs pain medication, and has double vision that affects his equilibrium and peripheral vision. (R. at 223.)

Dr. Raymond Nino, M.D., conducted a general medical examination of plaintiff on July 12, 2003. (R. at 182-89.) Dr. Nino noted that plaintiff had normal reflexes, sensation and motor strength. (R. at 184-85). Dr. Nino noted that plaintiff had antalgic[13] gait and could not perform heel-to-toe walking without holding onto the walls. (R. at 185.) Dr. Nino listed the following impressions / diagnoses: (1) diplopia and blurred vision of the left eye, pupillary defect of the left eye; (2) hypertension; (3) chronic pain of the lower back, left hip and femur which appears to be radiculopathy of the left leg. (R. at 185.)

Dr. Howard R. Goldberg, M.D., and ear, nose, and throat doctor, evaluated plaintiff on February 6, 2004. (R. at 254-56). It was his impression that plaintiff required further ophthalmological evaluation, follow up for his facial pain, and polysomnographic testing to determine whether plaintiff suffered from sleep apnea. (R. at 256.) Ultimately, such polysomnographic testing was done by Dr. S.K. Aneja, M.D., on June 13, 2004 upon Dr. Gosai's referral. (R. at 266-68.) Dr. Aneja concluded that plaintiff suffered from moderately severe obstructive sleep apnea syndrome. Id.

---

[13]"Antalgic gait" is defined as "a gait in which the patient experiences pain during the stance phase and thus remains on the painful leg for as short a time as possible." Taber's Cyclopedic Medical Dictionary at 844 (20th ed. 2005).

Dr. Gregory P. Mortimer, M.D., performed a physical residual functional capacity assessment of plaintiff and prepared a report dated August 11, 2003. (R. at 192-202.) Dr. Mortimer indicated that plaintiff could occassionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and had unlimited capacity to push/pull. (R. at 193.) Dr. Mortimer indicated plaintiff could occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl; however plaintiff could never climb ladders, rope, or scaffolds. (R. at 194.) Dr. Mortimer indicated on the worksheet that, regarding plaintiff's visual limitations, plaintiff had limited near acuity, far acuity, and depth perception but that plaintiff had unlimited accommodation, color vision, and field of vision. (R. at 195.) Dr. Mortimer reported that due to plaintiff's depth perception problems, he could not work where good depth perception is needed to perform work or for safety. (R. at 201.) Dr. Mortimer found that plaintiff remains fairly functional in his activities of daily living, and that while he reports diplopia, the ophthalmologist could not detect it on examination on March 15, 2003. (R. at 202.) Dr. Mortimer ultimately found that plaintiff's allegations of blurred and double vision, headaches, memory problems and low back pain with limitations in walking, standing, lifting, sitting and seeing to the degree that it prevents all work-related activity were not fully credible. Id.

*Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied.  20 C.F.R. § 416.920.  The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled.  Burns v. Burnhart, 312 F.3d at 119.  The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process.  Id.

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability on February 11, 2002; (2) plaintiff suffers from traumatic optic neuropathy, ptosis, degenerative disc disease, hypertension, asthma, and sleep

apnea of recent onset, which are severe;[14] (3) these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) there were jobs in the national economy that plaintiff could perform. (R. at 23-24.)

Plaintiff argues that the ALJ's decision was not supported by substantial evidence. In particular, plaintiff argues that the ALJ erred in not giving controlling weight to plaintiff's treating source medical opinions consistent with SSR 96-2P and that the ALJ erred in failing to give proper credit to plaintiff's testimony regarding his pain and limitations. The court addresses each of these issues in turn.

### *I. Whether the ALJ erred in not giving controlling weight to plaintiff's treating source medical opinions*

Plaintiff argues that the ALJ erred in not giving controlling weight to plaintiff's treating source medical opinions. In particular, plaintiff points to the opinions of Drs. Findlan, Gosai, and Scheib as not being given due weight. Plaintiff is correct in principle that, in making a disability determination, an administrative law judge has a duty to consider the opinions of treating physicians and to give them substantial weight. Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) (citing Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978)). An administrative law judge is not free to reject the conclusions of a treating physician in favor of his own contrary conclusions. See Wallace v. Secretary of Health and Human Services, 772 F.2d 1150, 1154-55 (3d Cir. 1983). Even if a treating physician bases his medical judgment upon the plaintiff's

---

[14]The ALJ found that plaintiff is moderately obese. (R. at 18.) To accommodate plaintiff's obesity, the ALJ considered it in conjunction with his impairments in assessing plaintiff's residual functional capacity. Id.

subjective complaints, the ALJ can only reject the treating physician's medical opinion if there is contradictory medical evidence. Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988) ("[T]he medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence.").

When the record contains conflicting medical opinions, it is the duty of the ALJ, as trier of fact, to resolve the conflict. Richardson v. Perales, 402 U.S. 389, 399 (1971). Essentially, an administrative law judge is required to review all the evidence presented and explain why he rejects probative conflicting evidence. In Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983), the court noted:

> While the ALJ is, of course, not bound to accept physicians' conclusions, he may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.

Here, the ALJ determined that even with his limitations, plaintiff retained the ability to perform a limited range of light work so long as the work did not require exertion above a light level or exposure to hazards occasioned by a limited field of vision or to poor ventilation or extremes of dust, humidity, and temperature. (R. at 19.) In the alternative, the ALJ found that even if plaintiff were limited to sedentary work with a sit/stand option in addition to the above limitations, plaintiff would not be disabled. (R. at 21.)

Substantial medical evidence of record supports the ALJ's findings concerning plaintiff's residual functional capacity. For example, with respect to plaintiff's eye impairment, the ALJ's assessment of plaintiff's residual functional capacity was consistent with the findings of Dr. Guehl that credited plaintiff's decreased acuity and double vision and yet found that plaintiff

could return to work in some capacity, but plaintiff should not drive or be on ladders or catwalks due to his eye changes. (R. at 127.) Concerning plaintiff's combined impairments, the ALJ's findings are supported by Dr. Nino's assessments (R. at 182-89) and Dr. Mortimer's assessments (R. at 193-96). For example, Dr. Mortimer found that plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and had unlimited capacity to push/pull. (R. at 193.) Dr. Mortimer indicated that while plaintiff could never climb ladders, rope, or scaffolds, plaintiff could occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl. (R. at 194.) Objective medical evidence, therefore, contradicted the opinions of plaintiff's treating physicians as to the extent of plaintiff's disability.

Moreover, Dr. Findlan's, Dr. Gosai's and Dr. Scheib's opinions as to the ultimate issue of disability are not entitled to deference. See 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)-(3) (2004). A treating physician's opinion on the issue of whether a claimant is unable to work does not bind the Commissioner – that decision is solely the responsibility of the administrative law judge. Id.; see Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) (treating physician's opinion that claimant is disabled or unable to work is not dispositive). Also, when a physician's opinion is inconsistent or unsupported by the record, the administrative law judge may give that opinion less weight. 20 C.F.R. §§ 404.1527(d)(3),(4), 416.927(d)(3),(4). Therefore, the opinions of Dr. Gosai, Dr. Scheib, and Dr. Findlan that plaintiff was disabled are not entitled to controlling weight and the ALJ did not err in the weight afforded these opinions.

The ALJ appropriately weighed the opinions of plaintiff's treating physicians, including the opinions of Drs. Gosai, Scheib, and Findlan, in light of the totality of the medical evidence of

record. The ALJ, however, determined that the residual functional capacity analysis adequately took into account plaintiff's symptoms that were demonstrated by the weight of the objective medical evidence. (R. at 19.) The ALJ did not err in the amount of weight he attributed to the opinions of plaintiff's treating physicians, but adequately weighed the objective medical evidence in the record and explained his findings with respect to any contradictions in the record.

      For example, concerning the extent of plaintiff's back problems, the ALJ considered Dr. Gosai's opinion that plaintiff suffered significant injury but did not find Dr. Gosai's opinion that plaintiff met the listing for musculoskeletal system controlling because Dr. Gosai did not explain what listed impairment was satisfied or what evidence supported his conclusion; and in fact the medical evidence of record, including the scans and MRI, did not show significant abnormalities of plaintiff's spine. (R. at 230, 233, 247.) In addition, concerning plaintiff's vision problems, the ALJ found that the objective evidence did not support the conclusions of disability to the extent of severity offered by Drs. Findlan and Scheib. The ALJ recognized that plaintiff had significant, though not disabling, limitations due to the vision problems plaintiff suffered as a result of the trauma to his left eye. The opinions of treating ophthalmologists Dr. Kent and Dr. Rhodes, for example, substantiate plaintiff's complaints of decreased visual field and visual acuity, intermittent double vision, and difficulty with depth perception. The ALJ adequately took these limitations into account, however, in performing the residual functional capacity assessment and in posing the hypothetical question to the vocational expert. Substantial evidence, therefore, supports the ALJ's assessment of the medical opinions of record.

***II. Whether the ALJ erred in failing to give proper credit to plaintiff's testimony regarding his pain and limitations***

Plaintiff argues that the ALJ failed to give proper weight to his subjective complaints. The standard for evaluating a claimant's subjective complaints is set forth in the Social Security regulations. See Hartranft v. Apfel, 181 F.3d 358,362 (3d Cir. 1999). Once a claimant establishes a medical impairment that could reasonably be expected to produce pain or other subjective symptoms alleged and which, taken with all other evidence, could lead to a conclusion of disability, the administrative law judge must assess the degree to which the claimant is accurately stating his or her subjective symptoms or the extent to which they are disabling. Id; see 20 C.F.R.§§ 404.1529(c)(2), 416.929(c)(2) (2004). In addition, upon review, an administrative law judge's findings on credibility are entitled to deference. See Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003); Schaudek v. Commissioner of Social Security, 181 F.3d 429, 435 (3d Cir. 1999).

Here, the ALJ analyzed the factors set forth in the regulations and explained why many of plaintiff's subjective complaints were inconsistent with or unsupported by the objective medical evidence of record. (R. at 21.) For example, the ALJ noted that though plaintiff's spinal condition reasonably may be expected to cause leg and back pain, there was not sufficient medical evidence in the record supporting plaintiff's testimony that he had to lie down for most of the day. Id. In addition, the ALJ noted plaintiff's testimony concerning unremitting headaches, but found that there was a lack of medical evidence supporting headaches that would disallow sustained work. Id.

Substantial evidence supports the ALJ's determination that the medical evidence of

record and plaintiff's own behavior did not support crediting the full extent of plaintiff's subjective complaints. The ALJ therefore properly considered plaintiff's subjective complaints in light of the objective medical evidence and the criteria set forth in the regulations and did not err in determining that plaintiff's subjective complaints were not fully credible.

*Conclusion*

Based upon the evidence of record, the parties' arguments and supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that the plaintiff is not disabled. The decision of the ALJ denying plaintiff's application for SSI and DIB is affirmed. Therefore, plaintiff's motion for summary judgment (Docket No. 8) is **DENIED**, and defendant's motion for summary judgment (Docket No. 10) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, David L. Garber.

The clerk shall mark this case as closed.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: March 28, 2006

cc:     Counsel of record